MISSOURI, K. & T. RY. CO. OF TEXAS v. SADLER.

(Court of Civil Appeals of Texas. Dallas. June 29, 1912. Rehearing Denied Oct. 12, 1912.)

1. MASTER AND SERVANT (§ 279*)—RAILROADS—INJURY TO SWITCHMAN—EVIDENCE—SUFFICIENCY.

In an action against a railroad company for injury to a switchman, who was thrown from a car by sudden jarring thereof, evidence *held* to sustain a finding that the engineer and another employé, whose duty it was to uncouple cars, were negligent, and that their negligence proximately caused plaintiff's injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 973–975, 978–980; Dec. Dig. § 279.*]

2. TRIAL (§ 143*)—PROVINCE OF JURY—QUESTIONS OF FACT.

It is the province of the jury to pass upon facts, where there is the slightest controversy.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 342, 343; Dec. Dig. § 143.*]

3. CONSTITUTIONAL LAW (§ 245*) — EQUAL PROTECTION OF THE LAWS—EMPLOYER'S LIABILITY ACT.

Employer's Liability Act (Acts 31st Leg. c. 10) § 2, which in part relieves employés engaged in operating railroads from the consequences of their own negligence in suits for personal injuries, does not infringe the equal protection clause of the fourteenth amendment of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 702; Dec. Dig. § 245.*]

4. COMMERCE (§ 58*)—INTERSTATE COMMERCE—EMPLOYER'S LIABILITY ACT—VALIDITY.

Employer's Liability Act (Acts 31st Leg. c. 10) § 2, which in part relieves employés engaged in operating railroads from the consequences of their own negligence in suits for personal injuries, is not invalid, under the commerce clause of the federal Constitution, as an attempt to regulate interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–86; Dec. Dig. § 58.*]

Appeal from District Court, Grayson County; B. L. Jones, Judge.

Action by Gus Sadler against the Missouri, Kansas & Texas Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

A. S. Coke and A. H. McKnight, both of Dallas, and Head, Smith, Hare & Head, all of Sherman, for appellant. Wolfe, Maxey, Wood & Haven, of Sherman, for appellee.

RASBURY, J. This is an appeal entered upon the verdict of the jury awarding appellee $6,750 damages in compensation for personal injuries alleged to have been received by him while in the performance of his duties as switchman for appellant at Ray yards, in Denison, Tex. Appellee, in substance, charged that it was his duty as a switchman to ride cars and "strings" of cars over the tracks of appellant, and that while so engaged he received the injuries alleged, and that same were due to the negligence of the appellant's engineer in suddenly and with unusual violence stopping the train of cars which appellee was riding and thereby precipitating him from same; and due as well to the failure of the pin puller employed by appellant to notify appellee of his failure to cut off or uncouple the "string" of cars which he was riding, in order that he might be prepared for the consequent shock and accordingly protect himself. Appellant pleaded the general denial, assumed risk, and contributory negligence, in that appellee did not stand at the proper place and in the proper position on the car at the time he received his injuries; for that appellee stood near the end, instead of in the middle, of the car, and was not holding to anything to prevent himself from being thrown from the car by the jars and jerks alleged, and that such jars and jerks frequently occurred in switching, and that appellee should have anticipated same, but negligently failed to take any precaution to guard against such conditions.

[1] By numerous assignments of error, appellant first challenges the sufficiency of the evidence to sustain the charge that the engineer stopped his engine and the cars attached thereto in a negligent manner, and, if he did, that such act was the proximate cause of appellee's injury; and also that the evidence fails to sustain the charge that the "pin puller" was guilty of negligence when he neglected to notify appellee that he had failed to uncouple the "string" of cars, and, if he did, that such failure was the proximate cause of appellee's injuries.

It appears from the testimony that appellant maintains certain switch "yards" at Denison, which are used for the purpose of dividing and making up its freight trains preliminary to sending same out over its road. The making up of trains is done with a switch engine manned by the engineer and fireman, assisted by a switch foreman, a pin puller, a switch tender, and such number of switchmen or "jockeys," as they are termed, as the occasion demands. It is the duty of the switch foreman to direct the pin puller and the switch tender upon which particular track each car from the train is to be placed. It is then the duty of the switch tender to connect the main or lead track with the switch track upon which the car or cars are to be placed. It is then the

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

duty of the pin puller to notify the switchman or jockey who is upon the string of cars how many cars he is going to ride, and onto which track they are going to be shunted. When the switchman is so notified, the pin puller then signals the engineer to start the train, and to give the cars such momentum as will roll them off the main or lead track onto the switch track for which they are intended, and as far thereon as desired. When the cars have acquired sufficient momentum to carry them to the desired spot, it is the duty of the pin puller to "lift" or "pull" the pin, thereby uncoupling the desired number of cars from the balance of the train and permitting them to roll onto the switch track in charge of the switchman. When so uncoupled, the switchman's duty is to ride the car or cars to their destination, setting the brakes, etc., and in general controlling the car or cars after same are uncoupled or detached from the engine and other cars, as the case may be. Appellee was a switchman or "jockey," and had been told by the pin puller that he was going to give appellee a "bunch" of cars to ride to track No. 3. After receiving such instructions, appellee took a position on the front car of the bunch which he was to ride, bracing himself thereon by "spraddling" his legs, set the brakes on the car, and stood thus in readiness to stop the bunch before they could collide with other cars at the end of switch track No. 3. The pin puller, whose duty it was to uncouple the bunch of cars that appellee was riding and permit same, by their own momentum, to continue on over switch track No. 3, failed or neglected to make the uncoupling, and thereupon signaled the engineer to stop the train, which he did, and as a result of which appellee was thrown a distance of 12 feet over the end of his car to the tracks below and injured as alleged. As stated, appellee alleged that when the pin puller failed or neglected to pull the pin and uncouple the cars it was his duty to notify appellee of the fact, in order that appellee might have warning that his cars would not roll on down the track, but would be stopped and thereby jerked, and that the pin puller was negligent in not so warning appellee; also that the engineer operating the switch engine which was pushing the cars, when he stopped same in response to the pin puller's signal did so with unnecessary and unusual suddenness, which act resulted in an unusual and unnecessary jar and jolt, and which, in law, constituted negligence.

Appellee testified: "After the pin puller had failed to pull the pin and make the cut, as he told me he was going to, it was the custom of the pin puller to give as easy a stop signal as he could to the engineer working the switch engine; then to notify the man on the top to look out. I was not given any notice to look out. I was the man on top. I said it was customary to notify the man on top of the car. He would halloa,

'Look out up there.' He would notify him by halloaing at him. I don't know when I learned that custom. I have known it for quite a while. That was the custom in Ray yards, and I knew it. He would halloa, 'Look out,' if he didn't make the cut, or something was wrong. That whole thing about stopping the engine the way I would stop it, and about notifying the man on top of the car, was the customary way of doing out there in Ray yards, and I had known it all the time while I had been there. Well, then, as we were shoving in, the cars kept getting faster and faster, and I went and took up the slack in the brake chain. Then all at once I heard the slack coming, and then I braced myself, and the next thing I knew I was going on over the top of the brake staff wheel towards the ground. I went over the end of the car. * * * I understood that they were going to cut off some of those cars from the rear end that I was to ride down. I thought they were cut off. As a matter of fact, they were not. A sudden stop of the engine and a slack running out of the cars was what threw me off the car; the sudden stopping of the entire string of cars. * * * That string of cars was going at least eight or ten miles an hour down there when it threw me off. When the car I was on stopped, it was a sudden stop. * * * I said that my car stopped very suddenly. * * * I was back about 10 or 12 feet from the east end of the car when I went over. The east end was the front end, the way they were shoving. I went over the end of the car when it stopped—east end. A switchman can lie down and hold on and protect himself from being jerked off the top of cars, if he knows that they are going to stop as they did in this case. I was 10 or 12 feet from the end, I judge, maybe more, when I heard that coming. When I heard it [slack] coming, I braced myself. I spraddled my legs out this way to stand the jar of the car. I was then 10 or 12 feet from the end of the car. When the jerk came, I went over the end of the car; went over the 12 feet. I stated the usual ways in which a switchman protects himself is to brace himself the way he stands, or by sitting down on the running board and catching hold of the running board. If, on this particular occasion, I had known that those cars were going to be stopped, that the uncoupling would not be made, and that they would be stopped as they were stopped, I would have sat down on the running board and held on to protect myself. I did not know how sudden the engine had stopped at the other end."

J. M. Phillips, the engineer, testified: "I don't know whether it is a fact that those cars stopped so suddenly and so hard that the switch crew immediately went to see whether or not that man on the car had been able to hold his footing, and hunt for him."

H. Smedley, one of the switchmen, testified: "I would not figure, if it is properly handled by the engineer, and the fellow that is giving the signals to the engineer, that it would be necessary for a man to get down and hug the footboard to keep from getting thrown off. * * * In the handling and switching of cars, riding cars, the jockey would not lay down and hold to the running board, go to bed, unless he has absolute knowledge that he is going to get a terrible jolt. You brace yourself on a car by spraddling your legs. If a man was standing in the middle of a car and braced, a car would have to be going about 15 miles an hour to throw him over the end of the car by being stopped suddenly. It would have to be going 15 miles an hour to throw a man that distance. The stop would have to be pretty sudden, in addition to that. In stopping under the conditions mentioned, the only jerk there is in the usual way of doing the work is the slack going out of the cars after the slack is shoved up. When you are going ahead, the slack is all against it. When you get a sign to stop, the slack goes out, and takes it back the other way. It causes a jerk the way the work is usually done."

F. O. Goltra, switchman, testified: "Where a train is handled in an ordinary manner, to stand in the middle of the car and brace their feet is not the only precaution that brakemen use. That is the ordinary precaution. Sometimes they sit down and hold to the running board. That is in the ordinary handling of stable cars or any empties. I don't tell the jury that whenever a switchman rides any empty car he has to sit down and hug the running board. He can either protect himself in the middle of the car, or hold to the brake staff. It is the usual precaution to stand in the middle of the car. I have stated, in answer to your questions, that in the ordinary handling of a drag of cars that the usual and customary precaution of a switchman for his own safety was to stand in the middle of the car and brace his feet. That is the usual custom. I said that he could either stand in the middle of the car and brace himself, or sit down on the running board, or swing to the brake staff. If he is in the middle of the car, that is the usual precaution. If a man is standing in the middle of the rear car on the running board and properly braced, it would require an unusual stop or unusual jerk to throw him off the end of that car."

L. T. Lallier, switchman, testified: "You can prepare yourself by getting back in the middle of the car, or getting down a sufficient distance so you won't get jerked off. They were kicked maybe harder that time than they are sometimes. There was a pretty good jolt when he [engineer] stopped. * * * John Keys was the pin puller that night. When he saw that he had not cut off the cars, and wanted to stop the engineer, he could have given him a very slow signal. He could have given him any kind of a signal he wanted to. It is up to the engineer as to whether he stops it slowly, according to the signal, or he might stop it pretty suddenly. * * * I have already stated that there was a pretty sudden hard jerk, harder than a great many that have been stopped in the yards. Ordinarily, unless the train is going pretty rapid and stopped pretty suddenly, you can sufficiently brace yourself standing on your feet. Unless there was some unusual speed or unusual stop, I could have protected myself by bracing my feet standing on the running board. * * * It was a good hard stop."

H. L. Gingles, switchman, testified: "The engineer could stop the cars so as not to give a hard jerk; that is, what he would consider a hard jerk. If he obeyed a slow signal, and the cars were going five or six miles an hour, he could stop those cars without putting the brakeman in extraordinary danger; but if the engineer stopped suddenly, of course, it makes the cars jerk hard, and he is liable to throw a man off. The ordinary and customary way to protect one's self in doing that work is to stand in the middle of the car and brace your feet, so as to withstand an ordinary shock. That is sufficient precaution to protect yourself against anything except an unusual and hard jerk."

W. G. Broll, switchman, testified: "The customary way to protect a man there, when he is riding a cut of cars, is for him to stand on the center of the car and brace himself. That is where I would stand. That is supposed to be sufficient precaution of any switchman against accident. If he did that, it would take an unusually hard jerk to throw him off. If he just got only such a jerk as was usual and ordinary in switching, it couldn't throw him off."

John Keys, pin puller, testified: "I had been speaking and complaining to the engineer about the hard stops that he had been making in doing the work out there. I would not say how many nights before this it was. I had complained a number of times to this man about the hard bump he was giving the cars; very frequently do. * * * As soon as those cars stopped, Mr. Slagle gave another stop signal again, and walked across to the drag, and I says, 'What's the matter, Slagle?' and he says, 'I am going up here to see if that man was jerked off.' He didn't say he knew he was jerked off, unless he was tied on. He gave another stop signal after the cars had stopped. The engineer can't move, except on signals from us. Slagle gave another stop signal to keep me from shoving the cars again. He gave that signal to me, and then he says to me, 'I am going to see if that man got jerked off.' The engineer could stop the cars so as not to

give a hard jerk; that is, what he would consider a hard jerk. If he obeyed a slow signal, and the cars were going five or six miles an hour, he could stop those cars without putting the brakeman in extraordinary danger; but if the engineer stops suddenly, of course, it makes the cars jerk hard, and he is liable to throw a man off. The ordinary and customary way to protect one's self in doing that work is to stand in the middle of the car and brace your feet, so as to withstand an ordinary shock. That is sufficient precaution to protect yourself against anything except an unusual and hard jerk. A man that does as much switching as an engineer running an engine understands as well as a switchman. With those stable cars, if a man will stop his engine gradually, it takes away the danger of a jerk there."

J. T. Carroll, switchman, testified: "It depends on where he is standing and how he is standing. If he is standing in the middle of a car and properly braced, it would take a pretty hard jerk to throw him."

W. M. Frost, switchman, testified: "No; the fact that the cars stopped did not let me know that he was hurt. The foreman, Slagle, walked down to the head end of the cars was what first attracted my attention to the fact that he was hurt. That was not a usual thing for him to do. It was an unusual thing. The next thing that attracted my attention to Sadler being hurt was Mr. Keys walking down that way. * * * When the brakeman is thrown or jerked down, it is not always the case that it is when the cars give an extraordinary jerk. It is usually the case."

The foregoing testimony is taken from appellee's brief as collated by his counsel to sustain the claim that there was such negligence as charged by appellee, and that hence the issue was properly submitted to the jury. In addition, we have carefully read the testimony as a whole, as disclosed by the statement of facts, in order that the force and weakness of the testimony, as quoted, might be seen and considered from every possible angle. From the evidence we do not think it can be said that the evidence was insufficient to sustain the claim that the engineer was negligent in the manner in which he brought the train to a stop. Appellee testified that the stop was so sudden that it threw him a distance of 12 feet over the end of the car, and did so notwithstanding he was braced in the usual and ordinary way, and so as to withstand ordinary jars—standing braced with legs spraddled—and a fair construction of the testimony as a whole sustains the claim that such attitude is the usual manner of bracing and is ordinarily sufficient to withstand the usual jerks and jars of switching cars. It may be, as appellant contends, that the character of cars being switched, which were unusually large

cars, known as stable cars, were, because of their size and weight and tendency to roll and swing, more difficult and more dangerous to ride; but if that be true it but furnishes, it seems to us, another reason why care should be exercised to see that the same should not be halted or stopped with unusual force and suddenness. We are speaking, of course, from the standpoint of appellee's testimony and the finding of the jury. As to whether or not it was the rule or the duty of the pin puller to notify appellee when he failed to uncouple the train, and thereby prepare appellee for the claimed unusual and unnecessary shock, appellee testified it was customary to give such notice, and stated that, had he received such notice from the pin puller, who knew he was expecting the cars to be uncoupled, and was unprepared for a sudden and unusual stop, he could have avoided the danger and consequent injury by lying down and holding to the running board, but that failing to receive such notice he braced himself in the usual manner, and so as to withstand the ordinary and expected shock, and that the first knowledge he had of the failure to make such uncoupling was given by the crash of the cars taking up the slack at a time when it would have been more dangerous to shift his position than it would have been to maintain same. The result was that he was thrown a distance of 12 feet over the end of the car, which, it seems, upon the application of the brakes, was halted instantly.

[2] It is but repeating a well-known rule to say it is the province of the jury to pass upon facts, where there is the slightest controversy, and that such rule has been jealously guarded and its enforcement maintained by the appellate courts; and it seems to us that the facts in the case at bar are such as to have required the issue of the negligence of both the engineer and the pin puller to be submitted to the jury for its determination. Heatherly v. Little, 40 S. W. 445; Railway Co. v. Stewart et al., 14 Tex. Civ. App. 703, 37 S. W. 770; Railway Co. v. Johnson, 125 S. W. 387; Railway Co. v. Parvin, 27 Tex. Civ. App. 60, 64 S. W. 1008.

[3] By appropriate assignment of error, appellant complains of the action of the trial court in charging the jury that the contributory negligence of appellee would not bar a recovery, but that any such negligence should only diminish the damages in proportion to the amount of negligence attributable to appellee. This portion of the charge was in response to section 2 of the Texas Employer's Liability Act of 1909 (Acts 31st Leg. c. 10), which in part relieves employés engaged in operating railroads from the consequences of their own negligence in suits for personal injuries. Appellant attacks this law, on the ground that it is class legisla-

tion, and hence violates the equal protection clause of the federal Constitution. In passing on this question, this court, speaking through Chief Justice Rainey, has held: "Is it such class legislation as is denounced by either the Constitution of the United States or of Texas? The act of the Legislature applies only to employés of railroads; and when an act embraces all of a specified class in a particular character of business, such act does not fall under the ban of class legislation inhibited by the Constitution." Railway Co. v. Taylor, 134 S. W. 819. On the same question, this court, speaking through Justice Talbot, has further held: "The statutes referred to are not violative of the equal protection clause of the fourteenth amendment of the federal Constitution. They are applicable to all persons of a particular class, affecting alike the employés of all corporations or persons owning or operating a railroad, when brought under their influence under like circumstances and conditions.'" Railway Co. v. Jenkins, 137 S. W. 711.

[4] By further assignment, it is also urged that said act is void, because it conflicts with the commerce clause of the federal Constitution, in that it attempts to regulate interstate commerce, which appellant asserts is the exclusive right of the Congress of the United States. In connection with this issue, it is not claimed that the work being done by appellee was in furtherance of, or had to do with, interstate commerce; nor does the pleading or proof establish such facts. On the contrary, appellant asserts that under the facts, and by authority of the rule in Railway Co. v. Hawley, 123 S. W. 726, and Railway Co. v. Neaves, 127 S. W. 1090, appellee, at the time of his injuries, was employed in intrastate business; and hence the case must be controlled by the state law. We think appellant correct in the claim that appellee was engaged in interstate business; but we dissent from the view that the Texas act is void for the reasons claimed. We adopt as our views the expressions of Chief Justice Willson, of the Court of Civil Appeals, Sixth District, on that point, as contained in Railway Co. v. Turner, 138 S. W. 1126. In passing on the identical question, that court said: "If it should be conceded that the state statute should be construed as an attempt to regulate interstate commerce, we do not think it should for that reason be held to be invalid, but think it should be held to be merely inoperative, in so far as it affects interstate commerce, while the federal statute remains in force."*

We have carefully examined all other assignments, and because we find no material error therein the judgment of the trial court is affirmed.